UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                Case No.  23-CR-113

MARKITA BARNES,

        Defendant.

---

**DEFENSE SENTENCING MEMORANDUM DETAILING CLIENT BACKGROUND & REQUEST FOR DEPARTURE AND ADDITIONAL VARIANCE FROM SENTENCING GUIDELINES PURSUANT TO 18 U.S.C. §3553**

---

The defendant, Markita Barnes, by Attorneys Nicole M. Masnica and Jason D. Luczak of Gimbel, Reilly, Guerin & Brown LLP, hereby submits this Sentencing Memorandum and formal request for departure from the U.S. Sentencing Guideline calculation, setting forth additional background information about her personal life, as well as the pertinent factual and legal considerations necessary for the court's review, pursuant to 18 U.S.C. §3553, ahead of the imposition of a sentence, set to occur on March 17, 2026.

1

**RELEVANT PERSONAL HISTORY & ADDITIONAL FACTUAL SUPPORT[1]**

NOTE:     Much of Ms. Barnes' biographical history and detail was presented to this court in the Pre-Sentencing Report (PSR) written and provided by the U.S. Probation Office. This section of the memorandum seeks to highlight much of the relevant background information and characteristics of Ms. Barnes', and to supplement as necessary, that will be important to the court's sentencing decision in this matter.

Markita Nirei Barnes is 33 years old and was born in Milwaukee, Wisconsin, into a large loving and supportive family. Ms. Barnes is the fifth child of thirteen and throughout her life has served as a strong support and role model for her siblings and other family members. Ms. Barnes was raised on Milwaukee's north side, growing up in a community with widespread poverty and pervasive community issues. While her parents were hard-working, law-abiding members of the community, they often struggled to make ends meet for their family. Money went to the basic needs of the children and to maintain a household and was always less than what they needed. Additionally, both of Ms. Barnes' parents had to work long hours to support their children and growing family, which would sometimes leave the children without supervision that would otherwise traditionally occur in the afternoons and evenings following their school day. With that said, Ms. Barnes' family is uniquely close, and she and her siblings have built very strong bonds over their unique and largely happy upbringing.

While Ms. Barnes is tremendously appreciative of the support and work ethic her parents instilled in her, the financial struggles she faced growing up very much shaped

---

[1] Included with this submission are 45 character letters and offers of support. (Exhibit A).

her desire to have healthy financial independence as an adult and particularly as a mother. Ms. Barnes has worked extraordinarily hard throughout her life to provide financial security and safe home for her children, her 11-year-old son, Derek (DJ), and her 6-year-old daughter, J'Adore. Ms. Barnes' dedication to supporting her family extends far beyond her children, and on several occasions, she has had taken on the duty of caring for her nieces and nephews, even after the legal issues with HFY began. For example, Ms. Barnes was the guardian of her niece and nephew, Kalhoni and Kamarion, throughout much of 2022 through 2024, until her sister was able to care for the children.

Her dedication as a mother and her commitment to offering them opportunities that she never dreamed possible as a child led her to her career in healthcare and her desire to become an entrepreneur. As the court heard at trial and as reflected briefly in the PSR, after graduating high school, Ms. Barnes sought her certification as a certified nursing assistant (CNA), obtaining the license the year after graduation. She also enrolled in college to become a registered nurse, attending Alverno College and then Milwaukee Area Technical College, leaving school to work full-time as a CNA. From 2014 until opening Here for You in 2020, Ms. Barnes worked as a traveling CNA, taking as many shifts as possible at the highest rate available to support her family, often traveling far outside of Milwaukee for assignment.[2] Many of her placements were in neonatal intensive care units, as she had a particular interest in working with infants. Her work as

---

[2] In addition to her work as a CNA, Ms. Barnes owned and operated a first-online, later-brick-and-mortar store named DJ's Fashion 4Kids. This store sold high-end children's clothing and Ms. Barnes also offered styling services for children and families photoshoots. As a result, she became well-known in the community for this service. (Exhibit B: Photographs of Storefront and Grand Opening Flyer).

3

a CNA also led her to take positions working with permanently disabled adults in both long-term care facilities and in group homes. Her experience working with this population, one that she truly enjoyed, led her to begin looking at the possibility of operating her own group home in 2019.

From then and throughout 2020, Ms. Barnes hired a business consultant with a knowledge base in the field to assist her in preparing to operate a group home. As part of the ownership and operation of a group home, Ms. Barnes began touring potential rental housing with the consultant in an attempt to find a safe home for residents that would meet the compliance obligations that apply to these facilities. While Ms. Barnes worked many hours as a CNA (for example, in 2020, she earned more than $90,000 working as a CNA as she often worked double-shifts and overtime to make extra money) and had saved some funds to begin her business, she was unable to qualify for a loan at that time to purchase a property due to credit issues, thus requiring her to rent the facility.

As Ms. Barnes worked toward opening a group home, in the summer of 2020, she saw the Facebook post of Lakia Jackson discussing the success of her businesses, to include both a group home and a prenatal care coordination company (PNCC). Ms. Barnes reached out to Lakia Jackson about the business, as she was not familiar with that type of company from the business-side (Ms. Barnes, however, was familiar with the services they provided as she herself was a client of a PNCC when she was pregnant and a young mother to her son, DJ). Ms. Jackson shared with Ms. Barnes the contact information for the business consultant she had used to form her own PNCC, Chappelle Roe, and referred her to the associated Facebook page for Ms. Roe. After looking into the

4

business and finding that it was much more financially feasible for Ms. Barnes to open a PNCC and that it would provide her the chance to work with struggling mothers like she had once been, she decided to refocus her efforts to that type of business and hired Chappelle Roe to assist her in forming and operating the company. At that time and until learning of the information from the Milwaukee Journal Sentinel investigation, Ms. Barnes was unaware that Ms. Roe had a checkered past and that she had been convicted for healthcare fraud related crimes (her felony charges were amended to misdemeanor state-level offenses), specifically for billing for services provided when Ms. Roe was out of town and not actually working with clients.

Ms. Barnes paid Ms. Roe her consulting fee, and in exchange, Ms. Roe[3] was to teach Ms. Barnes what she needed to know about the business and would personally create and submit Ms. Barnes' application to become a certified, Medicaid-eligible PNCC. Ms. Barnes unfortunately knew so little about the type of business and its operation that she was woefully prepared for what was to come. From late October 2020 through the end of 2021, Ms. Barnes operated Here for You PNCC. Throughout that year, she employed nearly forty coordinators who in turn enrolled around 1,000 women for services. Without question and as Ms. Barnes admitted on the stand, she did not follow the proper procedures and legal requirements as it related to the billing and services provided,

---

[3] While Ms. Roe was interviewed by the government and denies ever misguiding any of the now-indicted PNCC operators, to include Ms. Barnes, the fact that several problematic agencies used this business consultant to form their companies and committed near-identical billing mistakes resulting in substantial overbilling should cause a factfinder to be highly suspect of those self-serving denials. Ms. Barnes for her part, as included with her PSR objection, had documentation demonstrating that Ms. Roe even submitted Ms. Barnes' Medicaid application, signing the payment agreement as if she were Ms. Barnes.

marketing, and provision of baby supplies to clients, though she objects to the government's characterization of her as someone whose sole interest was scamming the Medicaid program and profiting from her unwitting clients. Ms. Barnes went into this endeavor with the plan to operate a successful business to provide for her family while performing an important and necessary service to the community she loved. When the business opened, however, and it came time to handle the business and compliance aspects required, she fell far short and violated the rules and regulations controlling the government-funded program. As a result of those errors and her many mistakes, she violated the law and has been convicted accordingly.

Ms. Barnes, in addition to her issues billing, admittedly provided baby items and services in the form of CBRF classes to clients in violation of the criminal statutes related to the provision of goods in exchange for signing up or maintaining government-funded services. All clients were given regular diapers and wipes, and she would purchase and provide essential baby items to those that needed them, such as pack n' plays to encourage safe sleeping, strollers, car seats when clients could not receive this through other resources and other baby needs such as swings, bouncers, baby bags, etc. Ms. Barnes, as she testified, had personally received these items when she had enrolled in the program as a young mother, and viewed the gifts as necessities for women who had very limited financial resources to make the purchases themselves.

Additionally, as she began her business during the height of the COVID shutdown, many of the traditionally available programs that provided these items to women and children in need were shut down or offering significantly limited services.

6

That reality is reflected in the often referenced GroupMe message chain presented at trial. There, Ms. Barnes' coordinators discussed the lack of resources for basics like car seats and formula, and the provision of these goods to meet their clients' needs. Ms. Barnes, of course, now understands the rules of the program and how her conduct violated the terms of the Medicaid payment agreement signed on her behalf, but with her permission, by Chappelle Roe.

Eventually, Ms. Barnes realized that she had been operating her business far-outside of the requirements of the law and began to attempt to remedy that issue in the summer of 2021. She admittedly, however, did not make an effort to cease billing or working with clients until she could be sure she had a handle on the rules and that she and her staff were following the law and billing requirements. Her attempts at correcting issues are reflected throughout the GroupMe chat, but that does not diminish the criminal nature of her conduct.

In addition to the issues addressed above, Ms. Barnes was truly dedicated to using the money she believed she had earned to provide for and better her community. In spring 2021, Ms. Barnes made Easter baskets for all children of clients and held a Mother's Day party for mothers she serviced. Ms. Barnes hired a hairstylist and a barber to give children of the mothers her company worked with to provide braiding and haircuts to every child. Throughout 2021, Ms. Barnes also held events for both clients and those in the community who would not need or possibly ever be provided services by a PNCC program. She organized a back-to-school community event, recruiting several businesses in the community to donate their time and services (to include bouncy houses, children's

7

activities and a barbecue) for the children of the community. This was neither a recruiting event, nor one that serviced those eligible for her business. There, she gave Nike Air Force One shoes, backpacks, outfits, and winter jackets to every child she could.

In 2021, she ordered hundreds of meals for the homeless, with her coordinators and her driving around the community to directly deliver food to those often forgotten. Notably, this type of community service was not new for Ms. Barnes, as evidenced at trial by the Facebook post she made prior to ever being paid by Medicaid, in which she was looking for volunteers to help pay for and serve Thanksgiving meals to those in need.

Regarding assistance to clients, Ms. Barnes personally obtained her CBRF certification to offer to clients of Here for You certification classes so they would have an easier time finding employment, as many worked, as she once did, as caregivers and CNAs. Much testimony and evidence was presented related to the baby shower Ms. Barnes' held in August 2021. While she does not dispute that this event offered those present the opportunity to enroll with her company, she did not exclude those serviced by other PNCCs and required no proof of pregnancy for attendees to receive diapers and wipes for their children. Ms. Barnes also hired a doula to be present at the event for the purpose of answering questions and providing guidance to the attendees. While her conduct ran afoul with the law, she had the true intention of helping others in the community and providing them with assistance. Ms. Barnes also cared for her coordinators, and after the business shut down, she took any who were mothers to Walmart to help purchase Christmas presents for them, as the shutdown happened in the weeks before the holidays.

8

Case 2:23-cr-00113-PP    Filed 03/10/26    Page 8 of 30    Document 125

To further illustrate Ms. Barnes' goals in forming the PNCC, the defense points to her conduct since the closure of HFY. Following the shutdown and coming to terms with how wrong things had gone, Ms. Barnes was determined to start over, this time making sure that every rule was followed and she obtained assistance in areas where she had previously had many issues. Ms. Barnes moved to Texas to start again and hired a nationally respected business compliance coach to assist her in forming a home healthcare business where she could focus on client services and caregiving, and a third-party billing service would ensure all billing was proper. Ms. Barnes opened Porter Home Health Services LLC in Royse City, Texas, in 2022, and through her leadership, she now employes 20 caregivers and CNAs who serve the disabled and home-bound throughout Texas.

In its second year of operation, that business grossed $1,016,051 and allowed her to receive a healthy, fully legal income as the operator of the business. Ms. Barnes also enlisted the assistance of an accountant who has worked with her on filing prior-year taxes she has missed and has ensured she is fully complying with the appropriate tax codes and paying her proper share of taxes, both personally and for the business. This business has also been vetted and monitored through her pretrial supervision requirements and has passed every state audit without any issue of non-compliance. Without a college degree and with all the cards stacked against her following the shutdown of HFY and the indictment in this case, Ms. Barnes finally created the life she wanted and when released from confinement, barring any unforeseen obstacle, will have the financial ability to make restitution to the government for her mismanagement related

9

to HFY. Ms. Barnes has started the process of transferring the company to another for the period of her incarceration so that the many clients her business serves will not see their care disrupted or stopped unexpectedly.

Ms. Barnes' move to Texas was great for her two young children as well. Since moving to Texas, her eldest has excelled in school and found joy in his education. He has consistently been on the honor roll and was chosen as "Most Likely to Become President" by his fourth-grade teacher last year. (Exhibit C). Her daughter, who has experienced some delays, has also obtained the special assistance she's needed and is in the process of an evaluation regarding her special programing and treatment needs. Ms. Barnes is most proud of her achievements as a mother and how she was able to keep her household on the right track throughout this process.

It has been extraordinarily difficult to come to terms with the fact that she will be going to prison as community supervision is not an option due to the charging of this case as aggravated identity theft. Preparing her children for her incarceration and lengthy absence has been the most difficult thing she has ever done. Ms. Barnes has taken the steps to arrange for her children to be separated from one another and to move back to Milwaukee and into the homes with their respective fathers. She has also sought therapy to help her children cope with the transition from being raised by their mother to living with their fathers full-time. On that issue, included in the letters of support is the plea from DJ's father that Ms. Barnes be given a report date following conclusion of the school year so that their son can complete the academic year at his current school and avoid any disruption the move back to Wisconsin will cause. (Ex. A, pg 5-7). He is also in the process

10

of securing safe housing and working to financially prepare (to include obtaining health insurance and school enrollment) to take over the daily care of their son.

Furthermore, despite Ms. Barnes' convictions and the issues with HFY, many members of this community continue to stand behind her. Included with this sentencing memorandum are 45 letters of support, including those from clients of HFY that support her position that her operation of this business was something more than the scam that has been portrayed throughout this process. Below is a brief summary of those letters[4] of support:

> **Verilia Rosemond** is Markita's mother. From a young age, Markita demonstrated determination and responsibility beyond her years. She was academically advanced, so much so that she skipped fourth grade, and has always loved educating herself in an effort to build a strong foundation for success. In 2009, while Markita's brother was battling cancer, Markita cared for her younger siblings so Verilia could remain at the hospital. Markita was just a teenager then, but she stepped up without hesitation. Markita was 5 months pregnant when another one of her brothers passed away in December 2018, but she still worked tirelessly to ensure everything and everyone was taken care of. A short time later Verilia faced eviction, and Markita opened her home to her mother and other siblings until they regained stability. Markita is a source of strength and stability in their family. (Ex. A, pg 3-4).

> **Derek Watson** is the father of Markita's 11-year-old son. He often worked on the road when they were together, and Markita did an excellent job of making sure their son never missed anything just because she was solo parenting. As a mother and co-parent, she's loving, dependable, and committed. Her kids are her top priority, and she is a positive and stabilizing presence. Derek authored a second letter requesting that, if the court determines that a custodial sentence is necessary, that consideration be given to allow their 11-year-old son to complete the current school year before any reporting date. Their son is currently in 5th grade – his final year of elementary school, and an important academic year for him as he prepares to transition into middle school. Additionally, STARR testing for grades 3-8 is scheduled to take place from April 7- May 1, 2026. (See Exhibit D). Derek is prepared to assume the role of his primary caregiver but will need to relocate him from Texas to Wisconsin to do so. In order to minimize the disruption to his education and emotional stability during what is already a difficult time, Derek requests a short transition period so he can responsibly organize matters, coordinate DJ's

---

[4] It should be noted that without any request from counsel, Ms. Barnes asked all those who were willing to provide letters of support to submit them with Docusign to ensure they were all professionally documented.

relocation, and prepare his home and schedule to fully assume the role of DJ's primary parent. (Ex. A, pg 5-7).

**Antwan Boyce** is Markita's brother. He's a single father and Markita helps to provide his kids with emotional support and stability. They feel safe and loved around her. She's patient, compassionate, and has a strong sense of responsibility. She has always stepped up without hesitation, and she genuinely cares for her family and is committed to doing what's right. (Ex. A, pg 8-9).

**Damari Boyce** is Markita's 17-year-old nephew. Markita is always there when he needs someone to talk to or when he needs help. She encourages him to stay in school, make good choices, and work toward a better future. She lifts others up and makes things better for the people she loves. Aunt Markita is an important role model in his life, and he is grateful for the encouragement and support she has given him. (Ex. A, pg 10-11).

**Delantay Boyce,** Markita's nephew, writes that "Tt Kita" has always been supportive and caring. She's loving and dependable and has checked in to make sure he was doing well and encouraged him to keep focusing on school and his goals. She's made sure he has all the necessary school clothes and supplies, helped pay for college applications, and helped cover basketball fees and uniforms so he can stay committed to his responsibilities. (Ex. A, pg 12-13).

**Markell Barnes** is Markita's brother and describes Markita as a source of strength, guidance, and support. She's caring, generous, and consistently puts the needs of others before her own. When Markell was undergoing chemotherapy Markita was one of his main supporters, offering encouragement, comfort, and strength when he needed it most. That has had a lasting impact on his life. (Ex. A, pg 14-15).

**Markiana Barnes** is Markita's little sister. Markita is a God-fearing woman of remarkable integrity and work ethic. She is a loving mother who goes to great lengths to ensure her children are well cared for, supported and loved. She's an engaged member of her community, always the first to volunteer for events without seeking recognition. She's helped countless individuals in need through her kindness and compassion. She's been a source of unwavering love and support for her siblings; the glue that held them together and a second mother when their parents didn't have enough time for them or couldn't be there like they hoped. Markita has always been there, always the first to call, always the first one to support them. (Ex. A, pg 16-17).

**Markayla Barnes** is Markita's 22-year-old sister. When it comes to the safety and needs of Markayla and her four kids, Markita has supported them as if they were her own. That's how Markita treats all children. Markita is not the oldest of their nine siblings but carries herself as if she is, handling the family's emotional and financial situations as if everyone's problems are her own. (Ex. A, pg 18)

**Marquise Barnes**, one of Markita's younger sisters, writes that Markita has led by example by showing respect to their elders and always finding ways to give back to the people around her. She is an amazing mother and someone their family looks up to.

12

Markita has encouraged her to pursue her dream as a musician and helped build her confidence and character into who she is becoming. (Ex. A, pg 19-20).

**Markerion Barnes** is Markita's younger brother. Markita cares deeply about her family and will sacrifice and go to great lengths to make sure the people she loves are taken care of. When Markerion was in high school (2022-2025) he didn't have a job or many clothes besides a few outfits and one pair of worn-out shoes. Markita went out of her way to make sure he had what he needed without asking. When he finished high school early, Markita made sure to attend his graduation even though she had other responsibilities. She also fought to make sure their nephew did not get placed into foster care. (Ex. A, pg 21-22).

**Markirea Barnes** is Markita's youngest sister. Markita is dependable, loving, and cares deeply about the people around her. She's looked up to Markita since she was little, and Markita has given her love and guidance and always made sure she had what she needed. She's a positive light for their family. When their family faced eviction in 2019, Markita opened her home to them while they worked to get back on their feet. (Ex. A, pg 23-24).

**Shantel Rosemond** is Markita's aunt and has watched her look for ways to help others since she was a child. Markita has had a caring personality and strong work ethic since she was young and has always tried to help when people are struggling by giving them encouragement, helping with a bill, or making sure they have food. When Shantel was dealing with an unsafe living situation, Markita stepped in without hesitation and assisted her with a place to stay while she got back on her feet. Because of her actions, Shantel, her children, and her grandson avoided homelessness. (Ex. A, pg 25-26)

**Brandon Roby** describes Markita as a constant part of his support system. She works hard and puts in extra time. She doesn't think twice about helping others, no matter who they are – she's been doing it her whole life. She's a wonderful mother, auntie and cousin and does a wonderful job taking care of everyone who depends on her. (Ex. A. pg 27-28).

**Charlesha Shaw** writes that Markita has always been there when she's reached out, no matter the situation, and has never hesitated to be supportive, to listen, or to help in any way she could. (Ex. A, pg 29).

**Nastasia Shaw** writes that Markita was incredibly supportive when she lost her mom in 2019. Markita took immediate action to make sure Nastasia was able to get back home from college (500 miles away), had the support that she needed, and did not face that loss alone. Markita then stepped in to make sure she wouldn't be kicked out of school due to an outstanding tuition balance. Later, Markita helped her move back to Milwaukee so she would have a support system during her pregnancy, helping her to navigate a time of uncertainty without her mom. She struggled with postpartum depression, and Markita stepped in again, inviting Nastasia to Texas to stay with her to help her through that dark period. (Ex. A, pg 30-31).

**Germaine Williams** is Markita's cousin and has watched her grow into a caring, hardworking, compassionate young woman. She is kind, generous, and genuinely concerned for others. She is an amazing mother and proudly puts her children first, and

13

she is also a loving daughter and devoted sister to her siblings. Her commitment to her family has always been unwavering. (Ex. A, pg 32)

**Robert Williams** is Markita's cousin. When Robert hit a rough patch in his life and needed somewhere to stay, Markita opened her own home to him to help him get back on his feet. She even allowed his then-girlfriend to move in so they could build some stability. Markita is a hardworking woman who treats everyone with kindness and respect and will lend a hand to anyone in need. (Ex. A, pg 33).

**Malcolm Barefield** is Markita's nephew, who says that Markita stepped in to support him when his father (Markita's older brother) wasn't always present. Markita made the effort to make sure that Malcolm knows his father's side of the family, knows he has a place in that family, and knows that he has a safe place to stay when he visits. When their home burned down, Markita helped take care of him despite her own struggles. She's supportive of both his goals and achievements, attending both his 8th grade graduation in 2021 and high school graduation in 2025. Malcolm doesn't know what his life would look like now if she hadn't stepped into his life the way she did. (Ex. A, pg 34-35).

**Giavanna Barefield,** Markita's niece, says that Markita has continued to be present for her in ways that have meant a lot during some very difficult years. Aside from making sure she has necessary school clothes and supplies, making sure that birthdays feel special, and taking her on trips, she makes sure that her mom schedules things like dental appointments for her. After losing her father in 2018, this makes Giavanna feel like someone is always looking out for her. Even when her dad was incarcerated between 2007 and 2015, Markita made sure Giavanna maintained a relationship with him. Markita has been a source of support, encouragement, and stability. (Ex. A, pg 36-37).

**Antoinette Sallis** knows Markita to be caring, generous, and dependable. She consistently shows love and support, often stepping in to help without having to be asked and without expecting anything in return. When Antoinette was opening her daycare business, Markita stepped in to help pay her household bills for several months, including groceries for her and her kids, when Antoinette's state benefits were unexpectedly lost. Markita was also very hands-on with helping to prepare the daycare so she could get up and running faster and regain stability. That is a true reflection of who Markita really is. (Ex. A, pg 38-39).

**Kellie Kohlmann** is the mother of Markita's nephew. Markita's brother died when his son was just two years old, and Markita, even though she was grieving the loss of her own brother, stepped up to be present in Kellie's son's life. Markita makes sure that her nephew continues to feel loved, supported, and connected to his dad's family. Markita shows up on the sidelines of her nephew's soccer games, and you can see how much it means to him to have her there cheering him on – his face lights up and he plays harder and with even more pride. Markita has been a constant source of strength, stability, and healing as Kellie's son has navigated growing up without his father, which has made an immeasurable difference. (Ex. A, pg 40-41).

**Qiana Elim** describes Markita as a person with a good heart and a loving mother to her children. Markita has also shown love and support to Qiana's children and made them feel cared for and supported. She has made sure that they experience life outside of Milwaukee, an opportunity they might not have otherwise had. (Ex. A, pg 42-43).

**Marquia Lewis,** Markita's sister-in-law of about 20 years, sees Markita as a constant source of support, inspiration, and guidance for her and her children. She is reliable, kind, patient, and willing to help others**.** Her two nephews, Marquia's sons, look to her for guidance and encouragement. Markita has also made a meaningful impact on the City of Milwaukee through her willingness to help those who are struggling. She's touched many lives and has always strived to bring positivity and support to her community. (Ex. A, pg 44-45)

**Leah Trevisan** is the mother of Markita's niece Giavanna Barefield. Giavanna's father – Markita's brother - was incarcerated for several years, and Markita often took Giavanna to visit him while he served his sentence, which allowed her to maintain a relationship with her father during that difficult time. When Giavanna's dad passed away in 2018, Markita stepped up in ways that continue to make a difference in Giavanna's life, not just financially, but even making sure birthdays are special and making sure she's included in family trips and activities so the connection to her dad's family stays alive.   Markita is someone Giavanna can rely on for comfort and support. (Ex. A, pg 46-47).

**Monica Hightower** is the mother of Markita's nephew Malcolm Barefield. Markita's gone above and beyond to be part of Malcolm's life, especially when his father wasn't present. Since 2018 she's picked him up during winter and summer breaks so he can connect with his father's family and has played a very important role in his life. Malcolm has autism and doesn't open up easily, but connects with Markita easily and even smiles in pictures with her, which is exceedingly rare and shows how much her presence means in Malcolm's life. (Ex. A, pg 48-49).

**Waunda Wison** describes Markita as always willing to help whenever someone is in need. She's witnessed her help many individuals, consistently going above and beyond what is expected to make sure families have what they need, whether it's time, resources, or just compassion. (Ex. A, pg 50).

**Destiny Eison Stallworth** is a longtime friend of Markita who describes her as an exceptional mother and the kind of person who shows up – no questions asked. Her loyalty and compassion are not selective; they extend to everyone she encounters, and she has a way of making people feel seen, valued, and supported.  When Destiny's son died in a car accident in December of 2023, Markita stepped in without being asked and made sure they had what they needed. She paid for the repast, checked on the family constantly, sat and listened, and made sure they did not feel alone. In December 2024, Markita put together his memorial celebration, ensuring his life was honored meaningfully.  (Ex. A, pg 51-52).

**Joelle Jones** describes Markita as kind, thoughtful and dependable; someone who always shows genuine care for others through emotional support, encouragement, and acts of service. (Ex. A, pg 53)

**Maria Lock** has known Markita for over a decade. During that time, Markita has been a steady source of support not only for Maria, but for all those around her. She's been an upstanding individual, is caring and thoughtful, and is willing to show up for others without hesitation. (Ex. A, pg 54).

**Shaqualia Spears** knows Markita as genuinely loving, caring, and selfless. She leads with compassion and naturally makes people feel supported, understood, and cared for. As a mom, she is deeply devoted to her children and is nurturing, present, and intentional in her care for them. Her kids are a reflection of her love, strength, and dedication. Markita goes out of her way to help others through emotional support and encouragement, and has shown resilience, humility and a desire to grow. (Ex. A, pg 55-56)

**Twanita M. Brown** is a caregiver and nursing student at Good Samaritan College of Nursing. Markita has become like a daughter to her over the last 15 years, and has consistently demonstrated kindness and generosity. She gives of herself whenever she is needed, putting her own needs behind the needs of others. She is confident that Markita has the capacity for growth and positive change moving forward. (Ex. A, pg 57-58).

**Schamara N** is a longtime friend of Markita who says that Markita shows up when others are struggling, listens without judgment, and gives even when it is difficult. Her character is rooted in compassion and responsibility. Her children are her first priority and she strives to guide, support, and protect them as a steady presence in their lives. Markita does not give up when faced with challenges or place blame on others; she reflects, learns, and works to do better. (Ex. A, pg 59-60).

**Karlisha Williams** emphasizes that Markita has two children who rely on her for daily stability, guidance and love; a role that she takes very seriously and has sacrificed for. She's consistently made efforts to help her family and her community, and people know that she is someone they can turn to for support, encouragement, and help when they're struggling. Markita's done a lot of reflecting since the onset of this case and has expressed sincere remorse and is rebuilding a life that ensures compliance with the law and honors her children and her responsibilities. (Ex. A, pg 61-62).

**Kellye Ross** mentions that, during a time in her life when she was experiencing homelessness and domestic abuse, Markita treated her with dignity and respect and helped her see that she was worth more than she was being given. That kindness helped motivate her to lift herself and her kids up out of that situation. When she started her own business during Covid, Markita was incredibly supportive and paid her more for her products that she was charging to make sure that she was successful. (Ex. A, pg 63-64).

**Nicole McNeil** was a care coordinator at HFY. When she came on board she wasn't trained to a full extent, but Markita always took the time to explain things thoroughly and often set coordinators from different companies aside to properly train newcomers and

16

communicate her expectations. Nicole provided every client she served with valuable resources for housing and rental assistance programs, followed up with clients regularly to help them gain stability and become successful mothers. Markita helped shape her into the professional specialist she is today. She was dedicated, hardworking, and deeply committed to helping her staff and the families they served. From the time Nicole started, Markita was adamant about the seriousness of compliance and professional responsibility. She is capable of rehabilitation and moving forward with an even greater level of caution, accountability and compliance. (Ex. A, pg 65-66).

**Sharron Batchelor** was a care coordinator for HFY and can speak to Markita's professionalism, business ethics and integrity. HFY was meant to support struggling moms who needed additional assistance, and they worked to connect families with valuable community resources and services to achieve stability and long-term success. Markita consistently demonstrated a high level of responsibility and dedication. She communicated clearly and respectfully and handled situations with maturity and professionalism. She strives to do what's right even when it requires extra effort. (Ex. A, pg 64-68).

**Triana Jackson** worked as a care coordinator at HFY after transferring from another agency. She experienced Markita to be professional, organized, and focused on serving the community. Triana provided referrals, resource assistance and ongoing support to her clients. Markita instructed coordinators to make corrections and follow updated procedures and emphasized the importance of documentation and compliance. Markita helped her grow professionally and she gained valuable experience while working with HFY. (Ex. A, pg 69-70).

**Monica Johnson-White** began mentoring Markita in 2023 when she sought guidance about opening a residential care home. They continue to communicate regularly about business operations, leadership, and regulatory compliance considerations. Markita is willing to acknowledge where she lacked experience and actively seeks guidance on how to make better decisions moving forward. She is willing to reflect on her mistakes, learn from them, and grow. Markita emphasizes the importance of slowing down decision making, researching regulations, and fully understanding policies before moving forward. She's open to constructive feedback and does not struggle to accept guidance. Markita demonstrates genuine reflection, humility, and accountability. (Ex. A, pg 71-72).

**RayVon Campbell** is a fellow mentee in Coach Michele's Home Care Mentorship and Coaching Program. RayVon writes that Markita conducts herself with professionalism, humility and respect toward others, and carries herself in a manner that reflects that she is focused on building a better future, personally and professionally. She is attentive, respectful, and engaged in the learning process and genuinely willing to learn and grow. (Ex. A, pg 73-74)

**Lakyaa Harris** knows Markita to be caring, dependable, and passionate; (Ex. A, pg 75-76).

**Tiishiana Johnson** says that Markita was consistently present and supportive throughout her postpartum period, which has had a lasting impact on her life and her children's lives.

17

Markita provided her with critical support in a very dark time, connecting her with programs and mental health resources including therapists to address her postpartum depression. Because Markita treated her with such compassion, respect, and patience, she was able to maintain her dignity and hope while she regained her stability. (Ex. A., pg 77-78).

**Danielle Lesueur** writes as a proud former client of HFY that Markita has been a mentor in many ways, encouraging her to remain focused and level-headed through her own legal troubles and to make better choices in the future. Markita has connected her with numerous job resources, guidance, and connections that have allowed her to find and maintain employment. When Danielle had no reliable transportation and no other options, Markita made sure she could get to work so she wouldn't lose that job. She's been a stabilizing and motivating force for Danielle. (Ex. A, pg 79-80).

**Sade Wright** is a caregiver and former client of HFY. The support Markita has shown has helped her get her through some of the toughest times in her life. Markita has big passion and has always done big things, and when Sade has experienced personal issues, Markita has been there with encouraging words and resources. (Ex. A, pg 81).

**Azarleyah Brown** is a personal friend and former client of HFY and received services and support during a significant period of her life. Markita was a reliable and compassionate resource even after that formal relationship ended. Markita continued to support her throughout nursing school, encouraging and motivating her during challenging times. (Ex. A, pg 82).

As highlighted above, Ms. Barnes has shown tremendous resilience and character throughout her life and in the time that followed the operation and closure of HFY. While she could have given up and just accepted the failure of HFY, she sought to better herself and to continue to fight for the health and wellbeing of her family. Her conduct since conviction has demonstrated that she has obtained all the tools and guidance necessary to ensure she will never run afoul with the law again and bears an extraordinarily low risk to the community and to reoffend. This should carry great weight with the court, as many in her position, have not shown the same strident determination for redemption and she could have given up at any time but made the choice not to do so. Ms. Barnes' life both before and after the operation of Here for You demonstrates her good character

18

and that the way HFY was handled was not at all representative of the type of woman she is and strives to be.

## ADDITIONAL DETAIL REGARDING PSR GUIDELINE CALCULATION

As both the final PSR and the defense sentencing submission are due on the same date, it is unknown what the specific PSR calculation will be and what disputes will remain in the updated report. Ms. Barnes, however, anticipates that the PSR calculation will likely fall into level 33 and that the offense related to the use of the illegally derived funds, Count 20 of the indictment, will be the leading conviction in terms of calculating the guidelines.

For the reasons stated in the PSR objection filed by the defense on March 3, 2026, Ms. Barnes continues to advocate for a lesser guideline calculation of 28 (notably, the parties initially missed in their respective submissions an error in the base level for the healthcare fraud counts, lower it from category 7 to category 6 – the parties agree to this change) and asks the court to resolve all factual and legal disputes remaining as detailed in the objection, pursuant to FED. R. CRIM. P. 32(i)(3)(B).

## SENTENCING CONSIDERATIONS

In *United States v. Booker*, the United States Supreme Court held that the Sentencing Guidelines are advisory, not mandatory. 543 U.S. 220, 246. The *Booker* court determined that the constitutional jury trial requirement is not compatible with the Sentencing Act as written and that some severance and excision are necessary. *Booker*, 543 U.S. at 248. The Court determined that the existence of § 3553(b)(1) is "a necessary condition of the constitutional violation." *Id.* at 259. That is, without this provision, that makes "the

19

relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges" – the statute falls outside the scope of the requirements of *Apprendi v. New Jersey*, which held that each and every fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. *Id.*

In *Booker*, the jury heard evidence that the offense had involved 92.5 grams of crack cocaine and convicted *Booker* for possessing more than 50 grams. *Id.* at 257. However, the judge, at sentencing, found that the crime had involved an additional 566 grams, for a total of 658.5 grams. *Id.* The Supreme Court in *Booker* found that a system that would require the jury, not the judge, to make the additional "566 grams" finding one in which the prosecutor, not the judge, would control the sentence. *Id.* The Court held that because the prosecutor who, through such a charging decision, would control the sentencing range, a system with a patched-on jury fact-finding requirement would mean different sentences for otherwise similar conduct, whether in the context of trials of plea bargaining. *Id.*

Accordingly, in *Booker*, the district court applied the Guidelines as written and imposed a sentence higher than the maximum authorized solely by the jury's verdict. *Id.* at 267. The Court of Appeals held that *Blakely v. Washington* was applicable to the Guidelines, concluded that Booker's sentence violated the Sixth Amendment, vacated the judgment of the district court, and remanded for resentencing. *Id.* The Supreme Court affirmed the judgment of the Court of Appeals and remanded the case. *Id.* On remand, the district court was ordered to impose a sentence a sentence in accordance with the

20

Court's opinion in *Booker*.

This determination was further developed in *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007). *Booker* reinstated the District Court judge's ability to craft a sentence within the court's discretion, applying the factors set forth in 18 U.S.C. § 3553(a). A sentencing court has considerable discretion to individualize the sentence to the particular offender, as long as the court's reasoning is consistent with § 3553(a). *See Rita v. United States*, 551 U.S. 338 (2007).

**I.      18 U.S.C. sec. 3553(a) Factors and Their Application**

Section 3553(a) states what a sentencing judge should consider:

(a)  Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider --

   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

   (2) the need for the sentence imposed --

      (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      (B)    to afford adequate deterrence to criminal conduct;

      (C)    to protect the public from further crimes of the defendant; and

      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

         (3)    the kinds of sentences available;

         (4)    the kinds of sentence and the sentencing range established for the applicable category of offense by the applicable category of defendant as set forth in the guidelines . . . ;

         (5)    any pertinent policy statement issued by the

21

Sentencing Commission:

> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

> (7) the need to provide restitution to any victims of the offense.

The Seventh Circuit post-*Booker* follows a three-step test in rendering a sentence: (1) district courts must continue to calculate a defendant's guidelines sentence precisely as they would have before *Booker*; (2) in doing so, they must formally rule on the motions of both parties, they must state on the record whether they are granting a departure and how that departure affects the guidelines calculation, and they must take into account the Seventh Circuit's pre-*Booker* case law, which continues to have advisory force; and (3) they are required to exercise their discretion by considering the relevant 18 U.S.C.S. § 3553(a) factors in setting the sentence they impose, regardless whether it varies from the sentence calculated under the guidelines. *See, e.g., United States v. Dean*, 414 F.3d 725, 728 (7th Cir. 2005).

Today, a sentencing judge is not required, or permitted, to presume that a sentence within the Guidelines range is the correct sentence, or the presumptive sentence. While the "applicable guideline nudges [the sentencing judge] toward the sentencing range . . . his freedom to impose a reasonable sentence outside the range is <u>unfettered.</u>" *United States v. Wachowiak,* 496 F.3d 744, 749 (7th Cir. 2007) (emphasis added).

## II.  Circumstances of the Offenses and Acceptance of Responsibility

Although the Guidelines are advisory in nature, they "provide the critical starting point for the sentencing court's analysis." *United States v. Hyatt*, 28 F.4th 776, 783 (7th Cir. 2022).

The Sentencing Guidelines are not presumptively reasonable for a sentencing district court, but it is nonetheless obligated to accurately calculate and then apply them as part of its sentencing calculus under 18 U.S.C. § 3553, and to give them consideration. *See United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005). Beginning with the Guidelines, it is anticipated that the PSR offense level calculated by the Department (understanding that there are currently disputes regarding the applicability of the certain level increases) presently places the calculation of the offense level at 33 with a presumptive period of imprisonment for 135 to 168 months. This calculation likewise does not include the appropriate Zero-Point Offender reduction set forth in USSG §§4C1.1(a) and (b), reducing the calculation by an additional two-points, lowering this to a level 31 classification with a guideline range of 108 to 135 months.

Further, the government cannot meet its burden in establishing the applicability of several other enhancers as detailed by in the defense's PSR objection. The defense contends that the government cannot establish by a preponderance of the evidence that Ms. Barnes committed obstruction of justice by presenting false testimony at trial to increase her sentencing guideline range on the affected counts. As detailed in the PSR objection, the jury need not have believed the worst interpretation of the evidence set forth by the government's theory of fraud to find Ms. Barnes guilty on all counts. She readily admitted on the stand to billing errors and operational practices that ran far afoul

23

with the Medicaid guidelines she promised to adhere to by seeking certification of her business.

Ms. Barnes further contends that a 4-level increase pursuant to USSG §3B1.1(a) does not apply, given that there was testimony presented at trial from three other witnesses, who testified that they engaged in health care fraud in the form of overbilling or back-billing at the behest of Ms. Barnes. While it is accurate that Ms. Barnes did employ more coordinators than those three women, no other coordinators testified to the extensive scheme of fraud or that they were instructed to overbill at the urging of Ms. Barnes. Further, Ms. Barnes disputes that she testified falsely at trial.

Additionally, prior to trial, Ms. Barnes repeatedly sought from the government a potential plea agreement that excluded a plea to the charge of Aggravated Identity Theft, and the defense likewise litigated several challenges to the legal applicability of the Aggravated Identity Theft charges to the factual circumstances of the case pre-trial, regarding the interpretation of *Dubin v. United States,* 599 U.S. 110 (2023). Yet, despite Ms. Barnes' willingness to accept responsibility and to change her plea, the government at each juncture declined to consider any plea negotiation that did not include a plea to at least one count of Aggravated Identity Theft, which requires a mandatory minimum term of imprisonment. Therefore, Ms. Barnes felt compelled to proceed to trial in order to preserve the challenge to the applicability of this enhancement and statutory provision as it is her position that the *Dubin* holding established that such an enhancer is not applicable in her case..

Under these circumstances, "conviction by trial . . . does not automatically preclude

24

a defendant from consideration for [the acceptance of responsibility] reduction," as one may accept responsibility for their conduct but still exercise his constitutional right to a trial to assert and preserve issues that do not relate to factual guilt. *See* USSG § 3E1.1. Ultimately, it is the sentencing court, who observed the trial, who is best suited to properly assess whether the defendant should be entitled to a reduction for acceptance of responsibility. Ms. Barnes contends that a two-point reduction is more than appropriate under the circumstances given her considerable attempts to resolve the matter short of trial while preserving important challenges to the Aggravated Identity Theft charges she was ultimately convicted of at trial.

Furthermore, in support of her request for diversion from the guidelines, Ms. Barnes points out that the single greatest factor impacting her guideline calculation is the "loss" incurred by Medicaid as alleged by the government. Actual loss, however, often referred to as "but for" loss, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1, comment. (n.3)(A)(i)). Pecuniary harm is reasonably foreseeable if it is "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." USSG §2B1.1, comment. (n.3(A)(iv)). The government always bears the burden of proving the facts support a sentencing enhancement, and the defendant does not have to prove the negative to avoid the enhanced sentence. *See United States v. Ford*, 22 F.4th 687, 692 (7th Cir. 2022); *United States v. Cain*, 155 F.3d 840, 843 (7th Cir. 1998).

While Ms. Barnes does not have grounds to the forfeiture or forthcoming restitution order, the amount of the "loss" used does not account for any of the legitimate work that

25

was done by Ms. Barnes and her coordinators. As testified to by Agent Jill Dring at trial, the investigation revealed that there were clients receiving good quality service from HFY and Ms. Barnes and there were coordinators with the company who were doing exactly what they needed to do. Former clients have likewise written letters of support enclosed with this submission, highlighting the valuable work that Ms. Barnes performed for them. As such, while the mechanics of the charge and prosecution establish a high value loss, that value is likely significantly inflated and more a recognition of the size of her business and the number of women serviced than the severity of her conduct.

As a result, the defense contends that given Ms. Barnes' acceptance of responsibility, ability and willingness to pay restitution, and particular and unique facts surrounding her community involvement, lack of any criminal record, role in her family and as a mother, along with her tremendous success in the face of hardship following this offense, should well-establish grounds for diversion from the guidelines. *Booker* and its progeny caution against a mechanistic application of the incarceration drivers that are built into the Guidelines, and the defense seeks this court's mercy and consideration of how Ms. Barnes has conducted herself both before and after her failure in operating HFY in fashioning the appropriate sentence well below the guideline recommendation.

### III.    The Sentencing Options of the Court

Courts may impose a variance outside of the guideline range after consideration of all relevant departure provisions. *Gall*, 552 U.S. at 49. A court may grant a departure and a variance in the imposition of a sentence (e.g., a departure for substantial assistance and a variance for the defendant's history and characteristics). *See United States v. Dalton*, 477

26

F.3d 195, 197 (4th Cir. 2007); *See also United States v. Wright,* 2008 WL 4722508 (M.D. Pa. 2008). A sentence is reasonable if the sentencing court gives meaningful consideration to the sentencing factors enumerated in sec. 3553(a), including the advisory sentencing guidelines, and arrives at a sentence that is reasonable in light of the statutory factors and the individual circumstances of the defendant. *Gall,* 552 U.S. at 53.

The court in *United States v. Juhay* underwent a similar evaluation of a defendant's individual circumstances to determine the sentence to be ordered. 254 F. Supp. 3d 1042 (E.D. Wis. 2017). There, the defendant pleaded guilty to theft of government benefits, 18 USC § 641, based on improper receipt of approximately $100,000 in SSI payments. *Id.* at 1042-43. The PSR determined that the defendant fell into criminal history category I, and ultimately produced a sentence range of 10-16 months in prison. *Id.* at 143. However, the court took defendant's personal circumstances into consideration. *Id.* Notably, the court stated that she experienced significant childhood abuse, she was the sole provider for two minor children, she did not have any substance abuse or other correctional needs, her prior record was limited to a retail theft, and she received numerous letters expressing support and stating that she was a positive influence on others in the community. *Id.* Ultimately, the court determined that a "sentence served in the community [was] sufficient to satisfy the purposes of sentencing," and ordered a probationary sentence with payment of $104,248.97 in restitution and community service. *Id.* at 1044-45.

Additionally, the Seventh Circuit in *United States v. Jung,* underwent a similar analysis of a defendant's personal circumstances to determine a sentence. There, a jury convicted defendant eight counts of wire fraud (18 U.S.C. § 1343) and two counts of

securities fraud (15 U.S.C. §§ 77q(a)). *Id.* at 839. Under the 1997 Sentencing Guidelines, defendant's suggested sentence range was 97 to 121 months of imprisonment *Id.* at 844. In determining that 109 months of imprisonment, three years of supervised release, and a restitution sufficed for sentencing, the district court judge emphasized that "he was taking into account the fact that Jung had no criminal record in determining the sentence and explained that he was sentencing Jung to the midpoint of the sentencing range because of "counterbalancing factors." *Id.* at 844. The Seventh Circuit, in evaluating this reasoning, stressed that "[t]his [c]ourt's role is not to choose between possible sentences but rather to review the reasonableness of the sentence imposed by the district court." *Id.* at 845.

Here, Ms. Barnes was convicted of a crime that carries a mandatory minimum sentence. The Court may not impose a probationary disposition in lieu of some term of imprisonment as an ultimate sentence. However, given the acceptance of responsibility Ms. Barnes has demonstrated, in addition to the substantial and noteworthy mitigating factors including Ms. Barnes' continued need to care for her children, the defense believes that a downward departure from the sentencing range recommended by the Sentencing Guidelines is appropriate.

Ms. Barnes respectfully requests that the court, in addition to finding a departure based on acceptance of responsibility, grant a variance from whatever guidelines range this court decides is applicable and sentence her to 24-48 months of imprisonment followed by a term of supervised release. If the court believes that some additional punishment and limitation of freedom is necessary, it can impose a sentence of home

28

detention, or the court may order a lengthier term of supervised release. Ms. Barnes is committed to the payment of restitution in full, despite the significant figure that is owed, and a longer period of supervision would serve as a mechanism for Ms. Barnes to make payments towards restitution while being supervised by the BOP.

In light of the 18 USC § 3553 factors, the nature of this case, and importantly, Ms. Barnes acceptance of responsibility and demonstration of remorse, the defense's recommendation is appropriate and the minimum term of incarceration and supervision necessary to protect the public, deter others from similar conduct, and to address any rehabilitative needs Ms. Barnes may have. Ms. Barnes is only one of several individuals who caused the significant loss to Medicaid as it relates to PNCCs in the Milwaukee area, but her conduct is not one in the same as those similarly charged. Ms. Barnes readily recognizes her role here and seeks to correct her wrongful actions and pay back the money that was wrongfully billed. It is clear from the PSR that there are significant mitigating factors that justify a departure from the sentencing range as set forth by the Sentencing Guidelines and she asks this court to do just that.

**RECOMMENDATION**

Ms. Barnes respectfully requests that the court sentence Ms. Barnes to 24-48 months of imprisonment. These felony convictions themselves with their inherent deterrence for a first-time offender without any criminal convictions and sentence of imprisonment at the mandatory minimum for the Aggravated Identity Theft counts, with conditions of community service, rehabilitation, training is the most reasonable and appropriate sentence under sec. 3553(a). Undersigned counsel does not recommend the

29

substantial term of imprisonment as set forth in the current sentencing range being recommended by the Sentencing Guidelines, as such would be inappropriate and unnecessary to impose upon Ms. Barnes.

Ms. Barnes further requests a limited stay of the commencement of her sentence and a report date over the summer so that she can properly conclude her business operations, and more importantly, keep her children in their current school until the conclusion of the school year.

Ms. Barnes reserves the right to further supplement these arguments orally at the sentencing hearing on Tuesday, March 17, 2026.

Dated this 10th Day of March, 2026.

Respectfully submitted,

GIMBEL, REILLY, GUERIN & BROWN

By: *Electronically Signed by Nicole M. Masnica*
NICOLE M. MASNICA
State Bar No. 1079819
JASON D. LUCZAK
State Bar No. 1070883
Attorney for Defendant

POST OFFICE ADDRESS:

330 East Kilbourn Avenue, Suite 1170
Milwaukee, Wisconsin 53202
Telephone: 414/271-1440